# United States Court of Federal Claims

**No. 08-646 C**
**(Filed Under Seal: January 23, 2009)**
**(Reissued: February 12, 2009)** [1]

---

**CARAHSOFT TECHNOLOGY CORPORATION,**

                    *Plaintiff,*

**v.**

**THE UNITED STATES OF AMERICA,**

                    *Defendant*, and

**MONSTER GOVERNMENT SOLUTIONS,**

                    *Intervenor.*

Negotiated Procurement; Technical Acceptability; Meaningful Discussions; Best-Value Analysis; Agency Corrective Action; Incorporation; Competition in Contracting Act; Bad Faith

---

*Frederick W. Claybrook, Jr.,* Crowell & Moring, Washington, DC, for plaintiff.

*Tara J. Kilfoyle,* United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant.

*Jacob B. Pankowski*, Greenburg Traurig, LLP, Washington, DC, for intervenor.

## OPINION AND ORDER

**Block,** *Judge.*

### I. INTRODUCTION

This is a post-award bid protest. Plaintiff, Carahsoft Technology Corporation ("Carahsoft"), challenges the Government Accountability Office's ("GAO") award of a contract to intervenor, Monster Government Solutions ("Monster"), for the procurement of an automated recruitment system. In its complaint, plaintiff alleges that this award was unreasonable and contrary to law. Plaintiff also asserts that GAO and Monster willfully conspired to violate the Competition in

---

[1] This opinion originally was issued under seal on January 23, 2009. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication. The redacted opinion is herein reissued for publication, unsealed, with only minor alterations to account for redactions.

Contracting Act of 1984 ("CICA").  Plaintiff asks the court to permanently enjoin performance of the contract and set aside the award to Monster in favor of plaintiff.  The case is now before the court on the parties' cross-motions for judgment on the administrative record pursuant to the RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS ("RCFC") 52.1.  For the reasons below, the court denies plaintiff's protest and enters judgment in favor of the defendant.

## II.  FACTUAL BACKGROUND

On July 17, 2007, GAO issued a request for proposals ("RFP") for the procurement of a web-based, vendor-hosted "Automated Recruitment System" on a five-year subscription basis, under the General Services Administration's ("GSA") schedule program.  AR 61, 68.  The RFP required the system to have the capacity to prepare and distribute job vacancy announcements, receive applications, rate and rank applicants, and notify applicants during and after the application process. AR 68.  In addition, the system had to offer "the capability to provide preformatted reports" as well as "generate *ad hoc* reports on a variety of variables and parameters with minimal knowledge."  AR 70.  According to the RFP, an example of such an *ad hoc* report would be a report showing "the names of applicants who meet certain criteria such as from which school they received their highest college degree, how many persons from a particular school were found to be qualified, well qualified, best qualified, and which persons were interviewed, not selected or selected, and those who declined job offers or who were hired."  *Id.*  The RFP also required offerors to provide same-day customer service support "to all classes of users both by e-mail and voice."  AR 71.

The RFP provided that GAO would award the contract to "the responsible offeror whose offer conform[ed] to the solicitation and [was] most advantageous to the government."  AR 97. GAO was to evaluate the technical merits of each proposal using the following evaluation factors and corresponding weights: (1) corporate experience, capabilities, and past performance (40 points); (2) management approach (30 points); and (3) technical approach (30 points).  AR 97–98.  While the RFP weighted the technical quality of proposals more heavily than the offered price, the RFP specifically provided that "[a]s proposals become more equal in their technical merit, the evaluated . . . prices become more important."  AR 97.

GAO sought to procure the system via a firm-fixed-price contract with a one-year base period and four option years to follow.  AR 73.  Under the heading "Pricing Schedule," the RFP required offerors to submit a separate document providing a "detailed list of components/modules . . . that are included as part of the offeror's proposed individual prices for [a]ccess to [the proposed] web-based Automated Recruitment System."  *Id.*

On July 30, 2007, Carahsoft and Monster submitted the only timely initial proposals in response to the RFP.  AR Tabs 11–13.  Monster was the incumbent contractor providing GAO's existing automated recruitment system.  AR 201, 207.

After the receipt of initial proposals, GAO subsequently amended the RFP five times with Amendments 2, 3, and 5 addressing concerns about the confidentiality of GAO data.  AR 609–11, 618–20, 644–46.  During this time, GAO held discussions with Monster concerning the wording of these amendments.  AR 1286–87, 1374.  Amendment 5 was, in part, the result of these discussions and inserted a new provision into the solicitation, which stated in part: "The contractor assumes full

responsibility for and guarantees the security of all documents, data, and other information supplied by GAO."  AR 644–45.

On the same day that Amendment 5 was issued, GAO placed both Carahsoft and Monster in the competitive range.  AR Tab 25.  Following this competitive range determination, GAO held discussions with both Carahsoft and Monster and requested final proposal revisions ("FPRs," also known as "best and final offers" or "BAFOs").  AR Tab 26.  In its discussions with Monster, GAO noted:

> It is not clear whether [Monster's proposed system's] reporting capability can provide the information about applicants by school that was requested in the [Statement of Work].  Question: Can your reporting tool provide reports concerning from which school applicants received their highest degree and a breakout of applicant ranking categories by school?

AR. 765.  Monster responded in its initial FPR,[2] stating:

> [Monster] is able to provide data out of the Hiring Management system that is unique to GAO's core questions, including questions on an applicant's education; however it is only available through customization of the tool.
>
> The core analytics tool contains all fields that are standard in Hiring Management prior to customization . . . and does not include customization clients make including questions and answers from the question library.
>
> * * *
>
> [Monster] has reviewed GAO's clarified requirements for reporting based on [an] applicant's education and [is] proposing customization of the Analytics tool to include an Education-Applicant Status product report, development of this report would be at an additional cost . . . .

AR 780-81.  Monster's initial FPR reflected the inclusion of the above-described customized "Education Product" and its associated price.  AR 790–93.  Monster's initial FPR also included a "detailed budget" which not only set out the base subscription price for its proposed system, but also included the following line items:

---

[2] Because there were ultimately two rounds of "final" proposal revisions allowed in this procurement, for the sake of clarity, the court will refer to an offeror's first FPR as its "initial FPR" and an offeror's subsequent FPR as its "second FPR."

| Product | Qty | Unit | Unit Price | Extended Price |
|---|---|---|---|---|
| Customer Support | | | | |
| Project Manager | [redacted] | Hour | [redacted] | [redacted] |
| | | | | |
| Hiring Management Analytics Core Functionality | | | | |
| Project Manager | [redacted] | Hour | [redacted] | [redacted] |
| Senior Developer | [redacted] | Hour | [redacted] | [redacted] |
| Developer | [redacted] | Hour | [redacted] | [redacted] |
| Business Analyst | [redacted] | Hour | [redacted] | [redacted] |
| | | | | |
| Hiring Management Analytics Custom Functionality-Education Product Report | | | | |
| Project Manager | [redacted] | Hour | [redacted] | [redacted] |
| Senior Developer | [redacted] | Hour | [redacted] | [redacted] |
| Developer | [redacted] | Hour | [redacted] | [redacted] |
| Business Analyst | [redacted] | Hour | [redacted] | [redacted][3] |

AR 793.  The total price given in this "detailed budget" was identical to the offered "Firm Fixed Price" in Monster's initial FPR.  AR 791, 793.

Carahsoft's proposal, on the other hand, contemplated either a subcontract or a partnership with its "service provider," Avue Technology Corporation ("Avue").  AR 429.  Carahsoft's proposed Avue system included a suite of 12 distinct web modules on an "all you can eat"[4] basis.  AR 316, 338–39.  In its discussions with plaintiff, GAO noted:

> 1.  The solicitation required that the offeror provide a list of at least five Government clients the firm has done business with as a contractor or subcontractor within the past three (3) years.  Your proposal did not provide any references for the prime contractor, Carahsoft.  Question: Can five references for Carahsoft be provided showing its ability to administer recruitment services as required by the solicitation?
>
> 2.  It is not clear from the proposal which elements of Avue's total human resources suite are being offered and therefore what are the functional boundaries of the "all you can eat service" that is included

---

[3] This is just a portion of Monster's detailed budget submitted as part of its initial FPR.  The entire detailed budget is included in this opinion as Appendix A.

[4] Carahsoft described the "all you can eat" basis as supporting "unlimited use by the client organization and its employees, as well as external users such as applicants."  AR 316.

> with this offering.  Question: What element or elements of the Avue
> HR Suite are being offered and what are the boundaries of the service
> offered associated with the offered element or elements of this suite?
> Please show how the element or elements are related and/or cross-
> referenced to the requirements of the solicitation.

AR 771.

Carahsoft responded in its initial FPR, stating, "Two of the references provided in the original Technical Response to this RFP are Carahsoft contracts . . . .  The following are three additional Customer references." AR 862.  Notably, Carahsoft did not describe these additional three references as relating to recruitment services or human resources services generally.  AR 863–65.  Additionally, Carahsoft asserted that all of the RFP's requirements were met by two of the offered twelve modules; Carahsoft did not reference the remaining ten modules at all.  AR 866.

GAO's Technical Evaluation Panel ("TEP") evaluated both proposals.  AR Tab 32.  The TEP awarded Carahsoft the maximum scores possible in both management approach and technical approach, but awarded only 35 out of a possible 40 points for Carahsoft's corporate experience.  AR 912.  The TEP justified this score by stating, "While [Carahsoft] provided [three] new references . . ., these [three] new references are not related to the administration of recruiting systems as specified in GAO's requirement." AR 913.

The TEP then awarded Monster the maximum scores possible in both corporate experience and management approach, but awarded only 25 out of a possible 30 points for Monster's technical approach.  *Id.*  The TEP explained:

> [Monster] responds . . . that they can clearly perform necessary
> programming to their database to accommodate GAO requirements to
> generate reports on applicants by school.  However, [Monster]
> documents in their response . . . that they are ". . . proposing optional
> customization of the ad hoc datasets to enable GAO to review
> applicant's education information . . . ."  Monster's BAFO cost
> proposal includes what we believe are sufficient hours custom
> programming.  This points up an inherent weakness of Monster's
> proposal.  That is, the reporting can be somewhat inflexible.

AR 914.  In sum, the TEP awarded both Carahsoft and Monster a total of 95 points out of a total of 100 points for technical merit.  The TEP thus concluded, "Both companies offer a product that can meet GAO requirements, the scoring for both was high and scores equal . . . .  For these reasons, we recommend that award be made based on low cost." *Id.*

Carahsoft offered a total evaluated price of $[redacted].  AR 853.  Monster offered a total evaluated price of $[redacted].  AR 791.  On May 1, 2008, GAO awarded the contract to Monster.

AR Tab 34.  The contracting officer's recommendation for award, signed by the source selection official,[5] stated:

> The technical proposals of [Monster] and [Carahsoft] were essentially technically equal as noted by the TEP's consensus evaluation scoring meeting.  [Monster] offered the lower overall price that is considered to be a best value and cost savings to the Government.
>
> * * *
>
> [Carahsoft's] rates/prices are [redacted]% higher than Monster['].s.  In summary [Monster] is hereby recommended for award base[d] on the lowest price and best value to the Government.

AR 921–23, 1381.

On May 2, 2008, Carahsoft filed a protest with GAO's Procurement Law Control Group ("PLCG")[6] contesting GAO's contract award to Monster on numerous grounds, including that GAO improperly evaluated the two proposals and conducted a flawed best-value analysis.  AR Tab 36.  Later, Carahsoft raised an additional protest ground arguing that an indemnification clause within Monster's initial FPR rendered Monster's proposal technically unacceptable because "it conflicts with the government's stated remedies and alters the fundamental allocation of risk under the RFP."  AR 1433-37.  The indemnification clause stated:

> [GAO] shall defend, indemnify and hold harmless, Monster, its affiliates and their respective directors, officers, employees and agents from and against third-party claims, actions or demands, including without limitation reasonable legal and accounting fees, arising or

---

[5] "Source selection official" is synonymous with "source selection authority" or "SSA."  RALPH C. NASH, JR. ET AL., THE GOVERNMENT CONTRACTS REFERENCE BOOK (2d ed. 1998).  The SSA's responsibilities include "selecting the source or sources whose proposal is the best value to the government."  FAR 15.303(b)(6).  The contracting officer is designated as the SSA, unless the agency head appoints another individual for a particular acquisition or group of acquisitions.  FAR 15.303(a).

[6] GAO is a legislative agency created by Congress in 1921 as part of the Budget and Accounting Act of 1921.  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  Over the years, Congress has tasked GAO with numerous functions, including the duty to hear bid protests pursuant to the Competition in Contracting Act of 1984.  *Id.* at 734 n.9; 31 U.S.C. §§ 3552–3556.  The GAO division which carries out this bid protest function is the Procurement Law Control Group.  *See, e.g.*, *Shel-Ken Properties, Inc.*, B-253614, Sept. 10, 1993, 93-2 CPD ¶ 52.  Here, GAO is not only the procuring agency, but also the forum in which Carahsoft filed two earlier bid protests.  AR Tabs 36, 63.  Thus, for the sake of clarity, this court will refer to GAO, the procuring agency, as "GAO" and GAO, the alternate bid protest forum, as "PLCG."

resulting from [GAO's] use of any gender or ethnicity data or any other [Equal Employment Opportunity] data provided by Monster.

AR 792.

On May 6, 2008, GAO issued a stop-work order to Monster.  AR Tab 37.  GAO issued this order, presumably, to comply with CICA's automatic stay provision at 31 U.S.C. § 3553(d)(3)(A)(ii), which requires agencies to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract" if the agency receives notice of a protest within ten days of the contract's award.  *See also* FAR 33.104(c).  However, the head of the procuring agency may override the automatic stay upon a written finding that performance of the contract is in the best interest of the United States or urgent and compelling circumstances will not permit waiting for the protest decision. 31 U.S.C. § 3553(d)(3)(C).

Following the stop-work order and while the bid protest was still pending, GAO awarded an extension or "bridge" contract for continuing automated recruitment services.  AR Tab 57.  This award not only extended the existing Monster contract for the expected duration of the bid protest, but also included two additional items that were previously proposed as part of Monster's initial FPR: (1) the Education Product described above; and (2) Monster's Hiring Management Analytics Core. AR 1783, 1800–01, 1804, 1831–32.  Moreover, the "bridge contract" included the same indemnification clause noted by Carahsoft in its then pending protest at GAO.[7]  AR 1802.  In making this award, GAO did not seek a formal override pursuant to § 3553(d)(3)(C) above.  Def.'s Mot. 37 n.7.

On August 1, 2008, the PLCG informed the parties during an "outcome prediction procedure" conference call that it intended to sustain Carahsoft's protest with regard to the indemnification clause, not because of the grounds raised by Carahsoft, but because the indemnification clause was likely a violation of the Anti-Deficiency Act.[8]  AR 1777–81.  GAO agreed to take the following corrective action:

> GAO will reopen discussions and request another round of FPRs (BAFOs) from both offerors.  Monster will be required to delete its indemnification clause or face elimination.  Both offerors will be permitted unlimited freedom as to the amount they wish to propose from a price standpoint.  No technical changes will be permitted.  In short, the objective of the new rounds of BAFOs is to eliminate the

---

[7] The indemnification clause remained in the "bridge contract" until August 6, 2008, when the parties removed the clause by amendment.  AR 1807.

[8] The Anti-Deficiency Act is codified at 31 U.S.C. § 1341 and precludes the award of government contracts in excess of, or in advance of, appropriations.  *PCL Const. Servs., Inc. v. United States*, 84 Fed. Cl. 408, 411 (2008); *accord* U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . .").

> indemnification provision in Monster's proposal and allow the offerors
> to compete on price alone.

AR 1779.

On August 8, 2008, GAO issued substantially identical letters to both Monster and Carahsoft with two exceptions. AR Tabs 60, 61. First, GAO's letter to Monster directed Monster to either delete the indemnification clause or face elimination. AR 1922. Second, the letters differed in how they conveyed the means by which GAO proposed to compare the second round of FPRs in light of the above-mentioned bridge contract awarded to Monster. AR 1919, 1923. Monster's letter provided:

> Under Modification 14 of . . . Monster's Bridge Contract, Extension
> Period . . . the Government acquired the Hiring Management Analytics
> Core Functionality ($[redacted]) and the Education Report
> ($[redacted]), both of which you previously bid for the Base Year in
> your latest BAFO. In order to achieve equal price competition and a
> level playing field, the Government will upwardly adjust, for
> evaluation and award purposes . . . any total amount that you propose
> by $[redacted] *vis-a-vis* the total fixed-price proposed by Carahsoft.

AR 1923. In contrast, Carahsoft's letter explained, "In order to achieve equal price competition and a level playing field, the Government will upwardly adjust, for evaluation and award purposes . . . the total price that Monster proposes by a certain amount *vis-a-vis* the total fixed-price proposed by Carahsoft." AR 1919.

With the two exceptions noted above, the letters to Carahsoft and Monster were substantially identical. Both letters provided:

> [D]ue to a pricing issue, the Government is hereby reopening
> discussions, on a limited basis, <u>solely</u> to obtain new pricing from both
> offerors. NO TECHNICAL PROPOSAL CHANGES WILL BE
> CONSIDERED OR ACCEPTED. YOUR TECHNICAL PROPOSAL
> IS FROZEN.
>
> * * *
>
> Once revised BAFO price proposals have been received, GAO will
> proceed to make an award based on the lowest overall price. . . .
>
> * * *
>
> For this reopening, do NOT submit a detailed breakdown of annual
> prices by list of components/modules as requested in the original
> solicitation . . . .

AR 1918–19, 1922–23 (emphases in original).

On August 15, 2008, Carahsoft and Monster submitted their second FPRs.  AR Tabs 64, 65. At this time, Carahsoft submitted another protest, objecting to "the appropriateness and adequacy of the corrective action described by the agency."  AR 1930.  Carahsoft also reasserted the grounds of protest that it raised in its previous PLCG protest.  *Id.*  Carahsoft offered a total evaluated price of $[redacted].  AR 2062.  Monster offered a total evaluated price of $[redacted].  AR 2062.  On August 27, 2008, GAO awarded the contract to Monster.  AR Tab 67.  The contracting officer's recommendation for award stated:

> A comparison of both Monster and Carahsoft 2nd total prices . . . respectively shows [Monster] offered the lowest price at a difference of [redacted]% ($[redacted]).
>
> * * *
>
> As specified in the 2nd FPR request . . ., we equalized the competition by adding the cost of $[redacted] for the two reporting tools purchased . . . .  This purchase of the two reporting tools was done pursuant to an urgent request from the Human Capital Office . . . and was within the scope of the original purchase order.  However, with the difference in cost of $[redacted] between the Monster and Carahsoft cost proposals, this equalization is insignificant and immaterial.  This means after adding the $[redacted] to Monster['s] 2nd FPR price, the Carahsoft 2nd FPR price is $[redacted] higher.  In summary [Monster] is hereby recommended for award based solely on the lowest fair and reasonable price.

AR 2068.  On the same day that GAO awarded the contract to Monster, the PLCG dismissed Carahsoft's second protest, stating:

> We strictly and in good faith followed the letter and spirit of the "outcome prediction" conference call that was conducted by the [PLCG].  As represented to that Office, we requested price-only BAFOs.  In our BAFO request, we leveled the playing field and did everything humanly possible to ensure price competition on an equal and fair basis.

AR 2081.  Less than a month after GAO awarded the contract to Monster and the PLCG dismissed Carahsoft's second protest, Carahsoft filed their complaint in this court.  Compl. 1.

## III.  STANDARDS FOR REVIEW IN BID PROTESTS

This court has jurisdiction over post-award bid protests and reviews agency actions in such cases under the standard of review set forth in the Administrative Procedures Act ("APA") at 5 U.S.C.

§ 706. 28 U.S.C. § 1491(b)(1), (4);[9] *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Accordingly, the court will only set aside an agency's contract award if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Stated another way, plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law. *Id.*; *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 466 (2008). The Supreme Court has described this standard of review as "a narrow one" and cautioned that "court[s] [are] not empowered to substitute [their] judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Moreover, plaintiff's burden is greater still where, as here, the contract was awarded subsequent to negotiated procurement rather than sealed bidding. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). During negotiated procurement, in contrast to sealed bidding, agency contracting officers are permitted to make "tradeoffs among cost or price and non-cost factors" and "accept [a proposal] other than the lowest priced proposal." FAR 15.101-1(c). In addition, contracting officers may conduct negotiations or discussions with offerors, and "[t]he scope and extent of [these] discussions are a matter of contracting officer judgment." FAR 15.306(d)(3). In sum, contracting officers engage in an inherently judgmental process when seeking best-value for the government during a negotiated procurement. *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (citing *Omega World Travel v. United States*, 54 Fed. Cl. 570, 578 (2002)); *see E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); *see also* RALPH C. NASH, JR. ET AL., COMPETITIVE NEGOTIATION: THE SOURCE SELECTION PROCESS (2d ed. 1999) ("The essence of the process is that the selection decision is based on a business judgment as to whether the added value of non-price factors is worth the higher price."). "Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier that it would be in a case of [sealed bidding]." *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct.Cl. 1980).

Should plaintiff meet the above standard and demonstrate an error in the procurement process, the court must then conduct a factual inquiry to determine whether the plaintiff was, in fact, prejudiced by the error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351, 1353 (Fed. Cir. 2005). This showing of "[p]rejudice (or injury) is a necessary element of [plaintiff's] standing." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). In other words, plaintiff must show "that there was a *substantial chance* it would have received the contract but for [the] error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)) (emphasis added); *see, e.g.*, *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1561–63 (Fed. Cir. 1996) ("On this

---

[9] 28 U.S.C. § 1491(b)(1) provides, "[T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." Section 1491(b)(4) provides, "In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

record, [plaintiff] has failed to show that the [potentially improper] communications between [defendant] and [intervenor] prejudiced it because it has not established that without these communications there was a reasonable likelihood that it would have been awarded the contract."). Yet, this standard is not so demanding as to require a showing of actual causation, i.e., but for the error, the plaintiff would have won the contract.[10]  *See Bannum, Inc.*, 404 F.3d at 1358.

Additionally, if, as here, plaintiff alleges that a government procurement official acted in bad faith (i.e., has engaged in fraud or some other quasi-criminal wrongdoing), then plaintiff must prove those allegations by clear and convincing evidence.  *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002).  This higher standard of proof is required in order to overcome the long-standing presumption that government officials act in good faith and in the public interest when carrying out their public duties.  *Id.* at 1239.

Finally, plaintiff also carries the burden of proof in establishing its right to requested injunctive relief.  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  Before this court may grant such relief, plaintiff must demonstrate that: (1) plaintiff is likely to succeed on the merits; (2) plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships between the parties favors the grant of injunctive relief; and (4) granting injunctive relief is in the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *FMC Corp.*, 3 F.3d at 427.  When applying the above test, "[n]o one factor, taken individually, is necessarily dispositive" and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp.*, 3 F.3d at 427.  However, where parties file cross-motions for judgment on the administrative record pursuant to RCFC 52.1, the court conducts an expedited trial and reaches the merits of the case, using a "paper record" to conduct fact-finding. *See Bannum, Inc.*, 404 F.3d at 1356; *Alion Science & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 20 (2005) (discussing judgment on the administrative record pursuant to RCFC 56.1, the predecessor to today's RCFC 52.1).  Accordingly, if the court should enter judgment against plaintiff under the framework of RCFC 52.1, as it does here, the court need not evaluate the remaining injunctive factors. *See Alion Science & Tech. Corp.*, 69 Fed. Cl. at 21.

## IV.  DISCUSSION

### A.      Plaintiff's Complaint and Claims for Relief

In its September 12, 2008 complaint, plaintiff asserted four claims for relief: (1) Monster was ineligible for award due to limitations in its initial FPR; (2) Monster was ineligible for award due to

---

[10] This court agrees with Judge Christine Miller's observation that two different "prejudice" standards are developing within Federal Circuit precedent.  In *Dyonyx, L.P.*, Judge Miller noted:

> Although the prejudice requirement for standing has been satisfied by a nominal showing that a protester "could compete for the contract," the prejudice requirement required for success on the merits consistently has been more stringent.  In essence these are incongruent, although slightly overlapping, standards.

83 Fed. Cl. at 465 n.2  (internal citations omitted).  However, this court need not choose one particular standard because plaintiff fails both.

the indemnification clause found in its initial FPR; (3) GAO's corrective action after the first PLCG protest was unlawful; and (4) Monster was ineligible for award because Monster and GAO willfully conspired to violate CICA. Compl. 5–8. However, as recounted below, plaintiff strayed far and wide from these initial allegations in its subsequent pleadings without amending its complaint. In addition, plaintiff raised entirely new points of contention during oral argument, to which defendant was wholly unprepared to respond. Accordingly, the court will only consider those claims and arguments of which defendant had notice and an opportunity to respond. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) for the proposition that under the federal rules of civil procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"); *see, e.g.*, *Resource Recycling Corp., Inc. v. United States*, 56 Fed. Cl. 612, 618 (2003) ("[C]ourts are rightfully loathe to allow a party to raise an issue at oral argument for the first time because there is a lack of notice to the court and adversary."); *Cubic Def. Sys. v. United States*, 45 Fed. Cl. 450, 466–68 (1999) (holding that permitting such tactics would contravene the federal rules' notice pleading requirements and constitute "litigation by ambush").

### 1.     Was Monster Ineligible for Award Due to Limitations in Its Initial FPR?

In its complaint, plaintiff initially asserted that "Monster qualified its offer under the initial competition by offering only a limited number of help desk hours and a single report which the Solicitation specified was only an example of the type of reports that might be required." Compl. ¶ 23. Thus, plaintiff concluded, "Monster's offer was ineligible for award and GAO was required to have rejected it." *Id.* Initially, this court understood plaintiff's complaint as forwarding two arguments: (1) that Monster's proposal was technically unacceptable because it did not "provide same-day customer service support to all classes of users;" and (2) that Monster's proposal was technically unacceptable because it did not provide the requisite level of *ad hoc* reporting as set forth in the RFP. AR 70–71. So too, did defendant, who expended six pages of its initial brief refuting these claims. Def.'s Mot. 26–32. Yet, plaintiff's subsequent pleadings took a different tact, arguing: (1) Monster did offer customer service support, but after a given number of hours, any further support would be provided via "level of effort pricing;" and (2) Monster did offer *ad hoc* reporting, but on a "time and materials basis." Pl.'s Am. Mem. 19–24, 27–28. In both instances, plaintiff asserts that Monster's proposal violated the RFP's firm-fixed-price requirement. Pl.'s Am. Mem. 19, 27. Plaintiff is wrong on all counts.[11]

Monster's initial proposal represented that its system could provide the *ad hoc* reporting required by the RFP. AR 219–21. In describing this capability, the proposal provided:

---

[11] Because the aforementioned firm-fixed-pricing contentions could be fairly characterized as "Limitations on [Monster's] Offer," and because plaintiff raised them early enough in the course of this litigation that defendant had an opportunity to respond, the court will address these arguments. However, the court will not entertain plaintiff's contentions that Monster's proposal included: (1) required system training on a non-fixed-price basis; and (2) a [redacted] call cap on applicant support by phone. The former was raised for the first time in plaintiff's response to defendant's motion for judgment on the administrative record, while the latter was raised during oral argument. Pl.'s Reply 15–16; Tr. 27–30. With regard to these last two arguments, the court "decline[s] to undergo the legal gymnastics of characterizing [plaintiff's] arguments as anything but 'too late.'" *Cubic Def. Sys.*, 45 Fed. Cl. at 467.

> The ad hoc reporting capability allows power users to dynamically modify reports (filter, search, sort & drill) to obtain unique and personal agency data views.  End users can define report criteria and layout at run-time to generate interactive ad-hoc reports.

AR 221.  However, the TEP identified a possible weakness with this system and in discussions with Monster asked, "Can your reporting tool provide reports concerning from which school applicants received their highest degree and a breakout of applicant ranking categories by school?"  AR 765.  Monster responded that while its initial proposal did not, its initial FPR did include a customized Education Product to meet the GAO's needs.  AR 780–81.  When the TEP evaluated Monster's initial FPR, it awarded only 25 out of a possible 30 points for Monster's technical approach, because, in the TEP's estimation, Monster's "reporting can be somewhat inflexible."  AR 913–14.

Plaintiff argues that this "inflexibility was in direct conflict with the [RFP's Statement of Work]."  Pl.'s Am. Mem. 23.  Plaintiff also asserts that Monster's initial FPR was unacceptable because it "did not include the full capability for ad hoc reports in its fixed monthly subscription price," but "[i]nstead . . . offered this capability as an add-on cost."  Pl.'s Am. Mem. 21.  To support these arguments, plaintiff relies on Monster's Service Level Agreement ("SLA"), which states:

> As this SLA relates to [commercial off the shelf] products sold under the GSA schedule, customized services may not be covered under this SLA.  Customized services may be available from [Monster] to meet the CUSTOMER'S specific needs, potentially at an additional cost and with a tailored service agreement that would be addressed in a separate document.
>
> * * *
>
> Billing for the monthly subscription for the Application will commence immediately upon contract award in quarterly increments unless otherwise agreed to in the task order.  Billing for labor-hour services will occur monthly following the month that services were performed.

Pl.'s Am. Mem. 21; Pl.'s Reply 17–18; AR 240, 253, 838, 842.  Next, plaintiff cites Monster's detailed budget, which illustrates the inclusion of the promised Education Product in Monster's initial FPR and an optional item entitled "Hiring Management Analytics Custom Functionality—Ad Hoc reporting."  Pl.'s Am. Mem. 21–22.  The detailed budget breaks down these products' extended, line-item prices into elements such as "Project Manager [redacted] Hour[s, at] $[redacted] [per hour] [for an extended price of] $[redacted]."  AR 793–94.

Finally, plaintiff points to Monster's "bridge contract," which provided the same services offered in response to the RFP, but on "a combination of firm fixed price and time and materials" bases and only for the limited duration of plaintiff's pending bid protest at the PLCG.  AR 1803–04.  From these facts, plaintiff concludes that Monster's initial FPR: (1) provided only one *ad hoc* report, contrary to the RFP's requirements; and (2) offered any other required *ad hoc* reports on a time and

materials basis. Pl.'s Am. Mem. 22. However, plaintiff's conclusions do not logically follow from the facts provided and ignore other relevant portions of Monster's proposal.

Contrary to plaintiff's assertion, "somewhat inflexible" *ad hoc* reporting does not equal technically unacceptable *ad hoc* reporting. Just because the TEP articulated a flaw in Monster's proposal and deducted five points in its evaluation of it does not mean that Monster's proposal did not provide the minimum required level of *ad hoc* reporting. Presumably, Monster could have proposed an even less-flexible means of *ad hoc* reporting that still would have been acceptable, but would have received only 15 points out of 30, or possibly even 1 point.

Moreover, plaintiff has pointed to nothing in the record that contradicts Monster's representation that its system provides the requisite level of *ad hoc* reporting after the addition of its customized Education Product. Throughout these proceedings, plaintiff has incorrectly asserted that because Monster provided a customized product in order to meet a weakness identified by the TEP, then any other optional customization Monster offered must therefore be necessary to meet the requirements of the RFP. Tellingly, the government did not exercise any of the offered customization options when it awarded the contract, presumably because additional customization was neither desired, nor required. *See* AR Tabs 33, 34.

In order to resolve plaintiff's allegations of time and material pricing, the court must consider not only Monster's initial FPR, but also Monster's pre-existing SLA and the RFP. As a threshold matter, the court notes that the principles governing the interpretation of government contracts apply with equal force to the interpretation of solicitations. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 n.4 (Fed. Cir. 2004) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed. Cir. 1996)). In either case, the court's analysis begins with the plain meaning of the text. *Id.* at 1353. The court then continues its analysis by interpreting the document as a whole, i.e., in a manner that harmonizes and gives reasonable meaning to all of its provisions. *Id.* Finally, the court must consider the meaning that a reasonable person acquainted with the contemporaneous circumstances would ascribe to the document's text. *United States Sur. Co. v. United States*, 83 Fed. Cl. 306, 311 (2008) (citing *Metric Constructor's, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999)). In other words, "context defines a contract and the issues deriving therefrom." *Id.*

Monster's SLA is a general agreement that applies to all contracts formed under its GSA schedule, and accordingly it must be written broadly enough to encompass a number of potential contracts, fixed-price or otherwise. Thus, the more natural reading of the cited provision is that it merely sets out a billing cycle for those contracts that include labor-hour pricing. The SLA does not compel the insertion of non-fixed-price terms in contracts where none previously existed.

The detailed budget that plaintiff cites is best viewed as a pricing breakout, whereby Monster illustrated how it arrived at each line item's extended price, instead of as an indication of time and materials pricing. This reading is supported by the RFP itself, which mandated that offerors "submit as a separate document a breakout that provides a detailed list of components/modules . . . that are included as part of the offeror's proposed individual prices . . . ." AR 73. Such breakouts are useful to contracting officers, who must determine that an offered price is "fair and reasonable" before making an award in a negotiated procurement. *See* FAR 15.402(a) ("Contracting officers must purchase supplies and services . . . at fair and reasonable prices."); FAR 15.404-1(a)(1) (The contracting officer is responsible for evaluating the reasonableness of the offered prices."). This

reading is further supported by the fact that when all of the line items' extended prices are summed, the total price in the "detailed budget" matches the "firm-fixed price" in Monster's initial FPR.  AR 791, 793.

Finally, and most importantly, plaintiff ignores the clearest evidence in the record that is on-point and instead cites to the irrelevant.  Yes, Monster's bridge contract provides that it is a "combination of firm fixed price and time and materials items." AR 1803.  However, this court fails to understand how the bridge contract could inform the court's interpretation of Monster's initial FPR, which unambiguously provides that "[Monster] understands that all prices offered to the GAO for this effort are firm fixed prices." AR 784.  At no point during the pendency of these proceedings has plaintiff attempted to dismiss, explain, or reconcile this clear expression of Monster's intent with plaintiff's own arguments.

Plaintiff's contention that Monster's proposal provided only [redacted] hours of "help desk" customer support in its fixed-price is nothing more than a rehash of its *ad hoc* reporting arguments outlined above.  *See* Pl.'s Am. Mem. 27–28.  Plaintiff cites the same SLA language, the same detailed budget and the same bridge contract, and again argues that these portions of the record demonstrate another deviation from the RFP's firm-fixed-pricing requirement.  For the same reasons these citations fail to support plaintiff's *ad hoc* reporting arguments, so too do they fail to support plaintiff's customer support arguments.[12]

From these facts, this court concludes that Monster's proposal was offered and accepted on a firm-fixed-price basis, and a firm-fixed-price basis alone.  Furthermore, Monster's proposal offered the minimum levels of *ad hoc* reporting and customer service required by the RFP, and thus was eligible for award.

### 2.     Was Monster Ineligible for Award Due to the Indemnification Clause in Its Initial FPR?

Plaintiff asserts that the indemnification clause found within Monster's initial FPR should have disqualified Monster from the contract's award.  Compl. ¶¶ 17–20.  The indemnification clause stated:

> [GAO] shall defend, indemnify and hold harmless, Monster, its affiliates and their respective directors, officers, employees and agents from and against third-party claims, actions or demands, including without limitation reasonable legal and accounting fees, arising or resulting from [GAO's] use of any gender or ethnicity data or any other [Equal Employment Opportunity] data provided by Monster.

AR 792.  Plaintiff contends that the clause "was unlawful because it represented a material alteration of the risks the RFP assigned to the contractor."  Pl.'s Am. Mem. 13 n.5.  During the "outcome

---

[12] Plaintiff also cites the same portions of the record and rehashes the same pricing arguments with respect to Monster's second FPR.  Pl.'s Reply 19–20.  Plaintiff's arguments here are weaker still, as Monster did not submit the detailed budget found in its initial FPR with its second FPR, per GAO's instructions.  AR 1918–1919, 1923.  Accordingly, for the aforementioned reasons, these arguments fail as well.

prediction," the PLCG stated that the clause likely violated the Anti-Deficiency Act. AR 1781. For the purposes of this opinion, the court will assume, without deciding, that under either theory, the clause rendered Monster's initial FPR technically unacceptable.[13]

Building on this point, plaintiff argues two alternative positions. First, plaintiff argues that Monster was ineligible for award because its initial FPR was technically unacceptable, regardless of whether GAO held meaningful discussions with Monster. *See* Pl.'s Am. Mem. 10–14 ("Because the agency both has conceded that the indemnification clause violated [the Anti-Deficiency Act] and recognized that its inclusion was a material deviation from the RFP, it should have disqualified Monster from further consideration in this procurement."). Second, plaintiff argues that GAO did, in fact, hold meaningful discussions or their equivalent with Monster, and thus Monster was ineligible for award after it nevertheless included the unacceptable indemnification clause in its initial FPR. *See* Pl.'s Am. Mem. 14–18 ("The lengthy RFP amendment process . . . put Monster on notice . . . that GAO had a clear and unwavering interest in limiting its own liability . . . . [O]nly willful ignorance would have prevented Monster from realizing that its indemnification clause . . . represented a material deviation from the solicitation. . . . . GAO was required, as a matter of law, to have disqualified Monster due to its limiting its risk by means of its indemnification clause."); Pl.'s Reply 3–8 ("Monster had the opportunity to remove its indemnification clause after GAO had warned it repeatedly that it rejected all efforts to shift liability to the agency for various types of improper data disclosures. Monster did not do so. . . . . [This] failure after meaningful discussions made Monster ineligible for award."). Both of plaintiff's arguments fall short of the mark.

In negotiated procurement, a proposal that fails to conform to the solicitation's material terms and conditions is technically unacceptable and ineligible for contract award. *See E.W. Bliss Co.*, 77 F.3d at 448 ("In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."). Thus, the concept of technical acceptability is roughly analogous to that of responsiveness in sealed bidding. *Cf.* FAR 14.301(a) (titled "[r]esponsiveness of bids" and providing, "To be considered for award, a bid must comply in all material aspects with the invitation for bids."). The concepts are only roughly analogous because, unlike a non-responsive bid in sealed bidding where there is neither a competitive range determination, nor subsequent rounds of discussions and offer revisions,[14] a technically unacceptable proposal may be considered for award if the proposal would otherwise be competitive and if its technically unacceptable terms can be cured by the offeror in a revised proposal. *See Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 974 (Fed. Cir. 1993) ("'[A] proposal must generally be considered in the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless.'") (quoting *M.W. Kellogg Co. v. United States*, 10 Cl.Ct. 17, 23 (1986)); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 841 (1999) ("[T]echnically unacceptable proposals must generally be considered to be within the competitive range if capable of being made technically acceptable and if the proposal's cost or price term is competitive.").

---

[13] GAO concedes that the indemnification clause is a violation of the Anti-Deficiency Act, but asserts that the clause was void *ab initio* and thus Monster's proposal was acceptable. Def.'s Opp. 4; AR 1657–58. Because the court finds that this particular issue is not dispositive, it will not address its merits here.

[14] *See* FAR 6.401(a)(3) ("Contracting officers shall solicit bids if . . . [i]t is not necessary to conduct discussions with responding offerors about their bids . . . .").

However, as this court noted in *Labat-Anderson, Inc.*:

> The situation is different with respect to [FPRs] . . . .  Because an agency generally may not re-open discussions after the submission of [FPRs], and because a technically unacceptable proposal cannot be considered for award, agencies must generally exclude a technically unacceptable [FPR] from the competitive range, regardless of cost or price.

42 Fed. Cl. at 841.  Plaintiff's first argument hangs on the above holding in *Labat-Anderson, Inc.  See* Pl.'s Am. Mem. 11–12.  However, plaintiff ignores the court's qualifying language.  While it is true that an agency *generally* may not re-open discussions after the submission of FPRs, an agency may do so if it failed to conduct meaningful discussions with a contract awardee whose proposal later proved to be technically unacceptable.[15]  *See Mantech Telecomm. & Info. Sys. Corp.*, 49 Fed. Cl. 57, 71–72 (2006).

Meaningful discussions are discussions that lead offerors into the areas of their proposals requiring amplification or correction.  *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 611 (2006) (citing *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001)).  The purpose of meaningful discussions is to "maximize the [g]overnment's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation."  FAR 15.306(d)(2).  To this end, "[c]ontracting officer[s] must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."  FAR 15.306(d)(3) (emphasis added).  A "deficiency" is defined, in part, as "a material failure of the proposal to meet a [g]overnment requirement."  FAR 15.001.

Assuming that the indemnification clause represented a material failure in Monster's proposal to meet a government requirement (a position plaintiff urges this court to take),[16] then GAO was required to indicate as much during its discussions with Monster.  Accordingly, plaintiff's first argument fails.[17]  Only if GAO held meaningful discussions with Monster regarding the

---

[15] Indeed, the court in *Labat-Anderson, Inc.* noted that the agency had conducted meaningful discussions with the plaintiff before reaching the above-quoted holding.  42 Fed. Cl. at 835.

[16] *See* Pl.'s Am. Mem. 18 ("[Monster's] indemnification clause . . . represented a material deviation from the solicitation.").

[17] Plaintiff appeared to concede this point at oral argument when plaintiff's counsel stated:

> We argue that they could not re-open discussions after they had discussions, made an evaluation, and made an award.  We have not argued that they could not re-open discussions if they discover this during BAFO evaluations.  That's not the facts here and [we'll] not argue about <u>nor would we argue that had they not discussed it, they couldn't open discussions after award</u>.

Tr. 20 (emphasis added).

indemnification clause would GAO then be required to disqualify Monster from receiving the contract's award.  To hold otherwise would place GAO between the devil and the deep blue sea.  If GAO, without warning, had disqualified Monster from the competition on the basis of the indemnification clause, its actions would have been vulnerable to protest by Monster for failure to hold meaningful discussions.  *See Mantech Telecomm. & Info. Sys. Corp.*, 49 Fed. Cl. at 72.

Thus, the issue turns on whether GAO, in fact, held meaningful discussions with Monster. Plaintiff correctly asserts that an agency is not required to "spoon-feed" offerors in order to have meaningful discussions.  Pl.'s Reply 3.  While meaningful discussions should be as specific as practical considerations permit, *Fort Carson Support Servs.*, 71 Fed. Cl. at 611, they do not require the agency to identify "each and every item that could be raised as to improve its proposal." *Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124, 131 (2000) (quoting *KBM Group, Inc.*, B-281919, *et al.*, May 3, 1999 at *6 (unpublished)).  Moreover, the issuance of an amendment to the RFP can satisfy the agency's obligation to conduct meaningful discussions if the amendment leads the offeror into those areas of its proposal requiring correction.  *See, e.g., Pauli & Griffin*, B-234191, May 17, 1989, 89-1 CPD ¶ 473 at *4; *Violet Dock Port, Inc.*, B-231857, *et al.*, March 22, 1989, 89-1 CPD ¶ 292 at *5 ("Amendment 0007 met the agency's obligation to conduct meaningful discussions since it led the protester into the areas of its proposal requiring correction.").

RFP Amendments 2 and 3 addressed GAO concerns about the confidentiality of its data.  AR 610–11, 618–20.  In response to these changes, Monster sent an e-mail to GAO proposing additional modifications to the RFP, including the following statement: "Contractor's duty to prevent unauthorized disclosures extends only to persons in contractor's employ."  AR 1286.  Two months later, the contracting officer replied that GAO could not agree to the above-quoted statement because it "[would] not provide the Government the level of protection necessary . . . ."  AR 1374.  This exchange and others led to the issuance of Amendment 5 (entitled "Confidentiality of GAO Data") a week later.  Plaintiff argues that Amendment 5 and the discussions with Monster leading up to Amendment 5 placed Monster on notice that its indemnification clause was unacceptable.  Pl.'s Am. Mem. 14–18; Pl.'s Reply 3–6.  Plaintiff cites the following portions of Amendment 5 in support of its argument:

> The contractor assumes full responsibility for and guarantees the security of all documents, data, and other information supplied by GAO.

> * * *

> The contractor will prevent any person other than the contractor's team members (or other persons for whom access is necessary for the completion of the contract) from seeing or having access to information in the possession or under the control of the contractor.

> The contractor will prevent any persons from disclosing the content or description of documents or information to any person not authorized under this contract or by the GAO to have access to such documents or information.

* * *

> Any deviation from provisions of this clause which is attributable to
> the contractor or to persons allowed on the contractor's premises
> constitutes a material breach of confidentiality and may be sufficient
> grounds for default.   Further the contractor agrees to save the
> [g]overnment harmless in the amount of any judgment against the
> United States resulting from such a breach.

Pl.'s Am. Mem. 16; AR 645–46.

Plaintiff argues that the terms of Amendment 5 "directly conflict" with the terms of Monster's
indemnification clause.  Pl.'s Am. Mem. 17.   In an attempt to illustrate this direct conflict, plaintiff
provides the court with the following hypothetical:

> Should Monster disclose . . . any gender or ethnicity data to any
> unauthorized persons within GAO . . . or provide GAO with such data
> knowing that the agency personnel receiving the data would use it in
> violation of privacy restrictions, such actions would result in a material
> breach of Amendment 5's confidentiality and privacy provisions.  The
> agency's remedies as set out in Amendment 5 . . . requir[e] the
> contractor to indemnify the government . . . .   Monster's
> indemnification clause flips Amendment 5 on its head and calls for the
> *government* to hold *Monster* harmless from . . . third party claims that
> result from Monster's breach of contract . . . .

*Id.* (emphases in original).

The most glaring problem with this hypothetical conflict is that it requires this court to read
a clause indemnifying Monster from third-party suits relating to GAO's use of EEO data as also
saving Monster from suits resulting from its own "breach of contract."  Even if such a fantastic set
of facts should present themselves, such a reading of the contract's terms borders on the absurd.

Assuming there were a court that could accept plaintiff's interpretation, plaintiff's hypothetical
is nevertheless a red herring.  The relevant inquiry is not whether there exists a possible set of facts
that could bring the two sets of terms into conflict, but rather whether the issuance of Amendment
5 should have led Monster to question the acceptability of its indemnification clause, thus satisfying
GAO's duty to conduct meaningful discussions.  Amendment 5 and the discussions leading up to
Amendment 5 dealt with the duties Monster owed to GAO with respect to confidential GAO data.
The indemnification clause dealt with a duty GAO owed to Monster if a third party were to bring suit
against Monster relating to GAO's use of Equal Employment Opportunity ("EEO") data supplied by
Monster.  Thus, the court finds no patent conflict between the provisions' respective terms that could
have alerted Monster to the deficiency in its proposal.  Accordingly, the court holds that the issuance
of Amendment 5 did not satisfy GAO's obligation to conduct meaningful discussions.

In summary, GAO's re-opening of the solicitation was neither arbitrary and capricious nor
contrary to law.  While it is unfortunate that GAO did not conduct meaningful discussions with

Monster prior to the submission of initial FPRs,[18] once GAO realized its mistake, GAO was compelled to take corrective action by re-opening the solicitation to allow Monster the opportunity to delete its unacceptable indemnification clause.

### 3.   Was GAO's Corrective Action Reasonable and Lawful?

Having decided that corrective action was necessary, the court must now consider whether the corrective actions GAO took were reasonable and lawful. Following the "outcome prediction" in which the PLCG informed GAO that it intended to sustain plaintiff's protest with regard to the indemnification clause, GAO reopened the solicitation and requested another round of FPRs. AR 1777–81, 1917, 1921. GAO permitted the offerors unlimited discretion in revising their price proposals, but did not allow them to change their technical proposals. In addition, GAO forced Monster to either remove the unacceptable indemnification clause or face elimination. AR 1918, 1922. GAO's stated purpose in taking these corrective actions was "to eliminate the indemnification provision in Monster's proposal and allow the offerors to compete on price alone." AR 1779.

Plaintiff asserts in its complaint that "[w]hen a negotiated procurement is reopened by an agency for revised offers, it must allow any revision to those offers the offeror may care to make." Compl. ¶ 26. For this proposition, plaintiff cites FAR 15.206 and FAR 15.307 without any preceding signal. However, these citations do not support plaintiff's proposition either directly or indirectly.

FAR 15.206, titled "Amending the [S]olicitation," outlines when a contracting officer may amend a solicitation and how such an amendment is issued. FAR 15.307, titled "Proposal [R]evisions," provides:

> (a) If an offeror's proposal is eliminated or otherwise removed from the competitive range, no further revisions to that offeror's proposal shall be accepted or considered.
>
> (b) The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

The court finds nothing in these regulations to support plaintiff's cited proposition. Indeed, this court has recognized that subsequent to an "outcome prediction," an agency may re-open a solicitation and allow offerors to make only limited revisions to their proposals. *See Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 627–29 (2005) ("[T]he agency's decision to expand the scope of the

---

[18] Indeed, GAO represents that it was not aware of the indemnification clause until plaintiff lodged its initial protest at the PLCG. *See* Def.'s Mot. 24; AR 1781 ("this indemnification clause[,] which our people missed").

corrective action to permit revisions to key personnel and subcontractors was reasonable, as was its decision to limit revisions to those aforementioned areas.").

This ability to limit proposal revisions derives, in part, from contracting officials' "broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition." *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999) (quoting *Rockville Mailing Serv., Inc.*, B-270161.2, Apr. 10, 1996, 96-1 CPD ¶ 184 at *4); *see also* FAR 1.602-2(b) ("Contracting officers shall [e]nsure that contractors receive impartial, fair, and equitable treatment."). Here, GAO's corrective action was aimed at ensuring fair and impartial treatment for both plaintiff and Monster. Plaintiff was assured that its competitor would not be advantaged via an unlawful indemnification clause, while Monster was granted the same meaningful discussions that plaintiff enjoyed.

Moreover, this approach recognizes the agency's interest in preserving its resources and the resources of the parties. Thus, the agency may salvage those portions of the procurement untainted by the problems identified in the protest. *See Serv-Air, Inc.*, B-258243, *et al.*, March 3, 1995, 95-1 CPD ¶ 125 at *2 (holding that agency may take corrective action by limiting offerors' proposal revisions to cost proposals where PLCG's prior decision found nothing improper in the agency's previous evaluation of technical proposals). The only problem that the PLCG recognized in the procurement was the indemnification clause in Monster's initial FPR. AR 1777–81. Despite plaintiff's assertions to the contrary, GAO should not be required to scrap its previously upheld technical evaluations, nor should the parties be required to resubmit technical proposals, when a more limited corrective action will remedy the impropriety. Every problem identified in a procurement does not necessitate an entirely new competition. *See id.*

According to plaintiff, GAO's corrective action was unfair because Monster's indemnification clause was a "non-pricing term," and thus, "Monster was allowed to alter both price and non-price factors while [plaintiff] was limited to price-only changes." Pl.'s Am. Mem. 33–34; Pl.'s Reply 25–28. However, plaintiff's counsel appeared to abandon this position at oral argument where he stated, "[W]e would also add that the indemnification clause has a cost aspect to it." Tr. 75. Regardless of whether the indemnification clause is a pricing term or not, GAO explained in its proposed corrective action that it would permit Monster to remove the indemnification clause. AR 1779. Indeed, the whole purpose of the corrective action was to resolve the indemnification clause problem, thus, it is irrelevant how the clause is characterized. AR 1779. When GAO allowed Monster to remove the indemnification clause, it was simply acting in conformity with the corrective action plan as proposed to the PLCG.

Finally, plaintiff argues:

> Had the agency allowed proper proposal revisions, Carahsoft could have improved its technical offering in the hopes of overcoming its greater price with a technical package that, on the whole, represented the better value to the government. Alternatively, Carahsoft could have scaled back its technical offering to match a reduction in price.

Pl.'s Am. Mem. 31. Again, plaintiff's argument misses the point—plaintiff had already enjoyed meaningful discussions with GAO, while Monster had not.

Plaintiff did not lose the contract award because its proposal was technically inferior.[19]  If anything, plaintiff offered too much and at too high of a price—a point already raised during initial discussions with plaintiff.  When asked to cross-reference the twelve modules included in plaintiff's "all you can eat service" to the requirements in the solicitation, plaintiff referenced only two modules; Carahsoft did not reference the remaining ten modules at all.  AR 771, 866.  At that time, plaintiff should have realized that these ten remaining modules were superfluous.  Plaintiff could then have "scaled back its technical offering" and its price accordingly.  Instead, plaintiff chose to offer all twelve modules.

The only other identified weakness in plaintiff's proposal was that plaintiff failed to provide the requisite number of relevant past performance references.  Again, GAO raised this point during its discussions with plaintiff when it asked, "Can five references for Carahsoft be provided showing its ability to administer recruitment services as required by the solicitation?"  AR 771.  The additional references provided by plaintiff in response did not relate to recruitment services, and the TEP deducted five points from plaintiff's corporate experience score accordingly.  AR 863–65, 912–13.

After reviewing the record, the court finds that plaintiff enjoyed meaningful discussions prior to the submission of initial FPRs, while Monster did not.  Thus, GAO's corrective action—allowing Monster to remove the offending indemnification clause while limiting any other revisions to price only—was a reasonable and lawful means of ensuring fair and impartial treatment for both competitors.[20]  This corrective action provided Monster with the benefit of meaningful discussions and remedied the impropriety identified by the PLCG.

### 4.     Does Plaintiff Possess Standing to Challenge the Instant Contract's Award on the Grounds That "Monster and GAO Willfully Conspired to Violate [CICA]?"

Plaintiff alleges that "Monster and GAO willfully conspired to violate [CICA]," thus rendering Monster ineligible for award.  Compl. ¶ 34.  Plaintiff argues that a written override decision pursuant to CICA's automatic stay requirements[21] was required when GAO awarded the bridge contract to Monster during the pendency of plaintiff's protest.  See Pl.'s Am. Mem. 35–40.  Plaintiff characterizes

---

[19] In fact, plaintiff's proposal received the maximum points possible for its technical approach.  AR 912.

[20] Arguably, GAO's corrective action benefitted plaintiff, not Monster.  As a result of the initial award notification, plaintiff knew the amount of Monster's winning price proposal, while Monster knew nothing about plaintiff's competing proposal.  Thus, plaintiff knew exactly how low its subsequent price proposal needed to be if it hoped to compete with Monster in the second round of FPRs.

[21] Plaintiff views the bridge contract as a "new procurement" and a "new contract award," rather than an extension of the incumbent contract.  Pl.'s Reply 32–33 n.11.  Thus, plaintiff also cites 31 U.S.C. § 3553(c)(1), which provides that "a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending."  Here too, CICA permits the head of the procuring agency to override this provision upon a written finding that "urgent and compelling circumstances . . . will not permit waiting for the decision of the Comptroller General . . . and the Comptroller General is advised of that finding."  31 U.S.C. § 3553(c)(2).

GAO's award of the bridge contract without a formal override decision as a "knowing" and "unabashed" violation of federal law, and asserts that Monster was "complicit" in this violation. Pl.'s Am. Mem. 36, 39; Pl.'s Reply 34–35. Finally, plaintiff concludes that this court must disqualify Monster from award of the protested contract because, otherwise, "these blatant [sic] CICA violations will effectively go unpunished." Pl.'s Am. Mem. 40; Pl.'s Reply 34–35.

This court has consistently held that the purpose of CICA's automatic stay provision is to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard the PLCG's recommendations to cancel the challenged award. *See, e.g.*, *Access Sys. Inc. v. United States*, 84 Fed. Cl. 241, 242 (2008); *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006); *Adv. Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006). Defendant admits that it did not formally override the automatic stay in this case, but argues that such an override was unnecessary because the bridge contract only met the agency's ongoing need for automated recruitment services until the protest could be resolved. Def.'s Mot. 36–38. In other words, defendant argues, the bridge contract maintained the *status quo*. *Id.*

To be sure, this court has encouraged and approved bridge contract awards as an alternative to a formal override where the bridge contract merely maintains the *status quo* during the pendency of the protest. *See, e.g.*, *Nortel Gov't Solutions, Inc. v. United States*, 84 Fed. Cl. 243, 250, 252 (2008) (holding that agency override decision was arbitrary and capricious, in part, because "the bridge contracts provide[d] a reasonable alternative"); *Access Sys. Inc. v. United States*, 84 Fed. Cl. at 243 (holding that award of bridge contract was not a *de facto* override because "the bridge contract [did] not disturb the status quo"); *Keeton Corrections, Inc. v. United States, Inc.*, 59 Fed. Cl. 753, 757–59 (2004) (holding that agency override decision lacked a rational basis where the agency could have continued awarding short-term, sole-source contracts to the incumbent contractor). However, plaintiff argues that the bridge contract's purchase of "items unique to the protested procurement," i.e., the purchase of Monster's Analytics Core and Education Product, "alter[ed] the 'status quo'" with regard to the protested procurement. Pl.'s Reply 30. GAO responds that these purchases were "critical" and emphasizes their *de minimis* amount, at a combined price of $[redacted] or "approximately [redacted] percent of the value of the new contract awarded to Monster." Def.'s Mot. 38; Def.'s Opp. 29.

Plaintiff, at least, has a plausible argument that the purchase of the Analytics Core and Education Products under the bridge contract was, indeed, a violation of CICA's stay requirements. However, even if the court were to reach the issue's merits and conclude that plaintiff is correct (which it does not), plaintiff's argument does not carry the day. Plaintiff has neither shown how this potential CICA violation harmed plaintiff's competitive position in the instant solicitation, nor demonstrated a "conspiracy" between GAO and Monster such that Monster should be disqualified from the instant contract's award. Indeed, the only prejudice alleged by plaintiff is that "if Monster were disqualified, [plaintiff] would receive the award as the lone remaining offeror in the competitive range." Pl.'s Reply 34.

However, there is no evidence in the record of a conspiracy, and tellingly, plaintiff cites none in its briefs. Plaintiff merely makes the bald assertion that Monster and GAO conspired to violate CICA. At oral argument the court asked plaintiff to "tell [the court] where in the record it shows that there is a conspiracy." Tr. 31. In response, plaintiff could only cite a single e-mail from one GAO employee to another GAO employee. Tr. 32–33. The e-mail stated:

Dee,

Given Andy's guidance to seek up to an [sic] 100-day extension of the old month-to-month agreement pending resolution of the protest activity relating to the Monster award, would you solicit a quote from Monster not only to include everything that was included prior to May 1, but also to include the Monster Analytics Reporting capability that we specified for the new contract. It is my understanding that the improved reporting inherent in Monster Analytics is one of the key requirements for HCO and I know that unless they say otherwise, they need to utilize this capability during the protest period.

Thanks!

John

AR 1823. The court submits that this email, standing alone, and to which Monster was not a party, does not satisfy plaintiff's burden of demonstrating a procurement official's bad faith by clear and convincing evidence, *see Am-Pro Protective Agency, Inc.*, 281 F.3d at 1239–40, much less a conspiracy between a government official and Monster. Indeed, before making the bridge contract award, GAO procurement officials sought the advice of agency counsel, which declared the award "legally sufficient." AR 1823. The fact that GAO sought and followed the advice of agency counsel when it awarded the bridge contract, further undermines plaintiff's claim that GAO knowingly conspired to circumvent CICA's requirements.

Because the court holds that plaintiff failed to meet its burden in establishing a conspiracy between Monster and GAO to violate CICA, plaintiff's proffered basis for disqualifying Monster evaporates, as does plaintiff's claim to suffering any prejudice. Assuming for a moment that plaintiff had demonstrated a conspiracy between GAO and Monster concerning the bridge contract's award, plaintiff has not cited a single legal authority for its proposition that this court must, therefore, disqualify Monster from the instant contract's award. Without a showing of prejudice, plaintiff is without standing to challenge the instant contract's award under this claim.

**B.    Plaintiff's Miscellaneous New Arguments**

**1.    Was GAO's Best-Value Analysis Reasonable and Lawful?**

Plaintiff asserts that GAO's best-value analysis of the initial FPRs was "flawed" and not in accordance with FAR 15.308. Pl.'s Am. Mem. 34–35. This is yet another example of plaintiff raising a claim in its pleadings that was not included in its complaint. *See* footnote 11, *supra*. When the court asked where this particular claim was plead in the complaint, plaintiff's counsel responded, "It's implied in the corrective action section." Tr. 25–26. Perhaps realizing the insufficiency of his answer, plaintiff's counsel then responded:

Pl.'s Counsel: [W]e're pleading to the proof. This issue was raised in the GAO protest, it was raised at the agency protest leading up to this protest. All the parties were aware of it. This isn't something . . .

Court: So that doesn't alleviate the need to raise it in the complaint?

Pl.'s Counsel: No.  At the time as we reviewed the agency record after receiving it, this issue became more important than we had realized.  We had talked about that issue as it related to . . . (inaudible).

Court: Should counsel have amended the complaint?

Pl.'s Counsel: I'm not sure, Your Honor.

Court: Okay.

Tr. 26.  Despite the fact that plaintiff did not include the "flawed" best-value analysis claim in its complaint, the court will nevertheless briefly address it, only in so far as to demonstrate just how "flawed" plaintiff's argument is.

The best-value process in a negotiated procurement is:

> [a] process [that] permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest-priced proposal.  The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented . . . .

FAR 15.101-1(c).  FAR 15.308, titled "Source Selection Decision," provides agencies with the following guidance when selecting a contract awardee:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation.  While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment.  The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.  Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

GAO's TEP applied the technical evaluation factors to each offeror's technical proposal.  AR 97–98, 912–14.  Carahsoft's proposal received only 35 out of a possible 40 points for corporate experience and past performance because Carahsoft failed to provide the requisite number of relevant customer references.  AR 912.  Monster's proposal received only 25 out of a possible 30 points for its technical approach because of its system's "somewhat inflexible" reporting.  AR 913.  On the remaining technical factors, both proposals received the maximum scores possible.  AR 912–14.  In summary, both technical proposals received 95 out of a possible 100 points.  Thus, the TEP concluded, "Both companies offer a product that can meet GAO requirements, the scoring for both was high and

scores were equal . . . . For these reasons, we recommend that award be made based on low cost." AR 914.

Carahsoft's initial FPR offered a price of $[redacted], while Monster offered a price of $[redacted]. AR 791, 853. The contracting officer's recommendation for award, signed by both the contracting officer and the SSA, adopted the TEP's conclusion, stating:

> The technical proposals of [Monster] and [Carahsoft] were essentially technically equal as noted by the TEP's consensus evaluation score meeting. [Monster] offered the lower overall price that is considered to be a best value and cost savings to the Government.
>
> \* \* \*
>
> [Carahsoft's] rates/prices are [redacted]% higher than Monster[']s. In summary, [Monster] is hereby recommended for award based on the lowest price and best value to the Government.

AR 921–23. Thus, the record demonstrates that GAO compared each offeror's proposal against the solicitation's evaluation factors and includes GAO's rationale in making the award.

However, during the pendency of Carahsoft's initial protest before the PLCG, the SSA submitted a declaration restating the above reasoning and concluding, "The Carahsoft offer with the additional bells and whistles [came] at a premium cost of an additional $[redacted] . . . . It would be unconscionable for the [g]overnment to pay such a high cost for additional items that clearly exceed its minimum needs." AR 1381. Carahsoft argues that this "*post hoc*" declaration proves that the SSA failed to conduct a contemporaneous best-value tradeoff analysis and impermissibly "converted the procurement into technical acceptability, low cost."[22]  Pl.'s Am. Mem. 34; Pl.'s Reply 24–25.   In support of this argument, plaintiff cites *Serco Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008) for the following quote:

> Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. . . .  [G]eneralized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions.

Pl.'s Am. Mem. 35.  Plaintiff is mistaken in both its legal arguments and its choice of quotes.

This court has previously recognized that where proposals are technically equal, a best-value tradeoff analysis between price and technical factors is not required.  *Consol. Eng'g Servs., Inc.*, 64

---

[22] Presumably, plaintiff is referring to the alternative "lowest price technically acceptable process" in negotiated procurement, whereby "proposals are evaluated for [technical] acceptability but not ranked using the non-cost/price factors."  FAR 15.101-2(b)(3).  In other words, in a lowest price technically acceptable procurement, there is no best-value tradeoff.  FAR 15.101-2(b)(2).  Award is instead made to the offeror with the "lowest evaluated price" and a proposal "meeting or exceeding the acceptability standards for non-cost factors."  FAR 15.101-2(b)(1).

Fed. Cl. at 635 n.26; *cf. DIT-MCO Int'l Corp.*, B-311403, June 18, 2008, 2008 CPD ¶ 124 at 7 ("While the protester is correct that agencies must adequately document cost/technical tradeoff decisions, . . . no cost/technical tradeoff was required here, since the proposals were determined to be technically equal and the agency made award to the offeror submitting the lowest priced proposal."). A best-value tradeoff analysis is not required because under such circumstances—a best-value tradeoff is not possible. No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available.[23]

Plaintiff's quote from *Serco Inc.* is misleading. In *Serco Inc.*, the court was addressing a situation in which an agency awarded contracts to offerors with higher-priced, technically superior proposals. *See Serco Inc.*, 81 Fed. Cl. at 465. Thus, in *Serco Inc.*, a best-value tradeoff was at least possible, as the agency had the option of selecting either higher-priced, technically superior proposals, or lower-priced, technically inferior proposals. In its brief, plaintiff's quote from *Serco* omits the preceding sentence. The full *Serco* quote, in context, provides:

> Finally—and many cases turn on this point—the agency is compelled by the FAR to document its reasons for choosing the <u>higher-priced</u> offer. Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. Indeed, apart from the regulations, generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions.

*Id.* at 497 (emphasis added). Unlike *Serco*, here there existed a technically equal, <u>lower-priced</u> proposal which the agency selected. There was no "tradeoff calculus" to be performed. Whether accompanied by a contemporaneous, independent SSA best-value tradeoff analysis or not, an agency decision to select a technically equal, higher-priced proposal would itself be arbitrary and capricious.

Plaintiff has failed to identify any fault in the evaluation of the two proposals. The record demonstrates that GAO applied the technical evaluation factors set forth in the RFP. In the TEP's judgment, the proposals were technically equal. The contracting officer and the SSA agreed, and accordingly awarded the contract to Monster based on its lower-priced proposal. The SSA did not provide a contemporaneous, independent, best-value tradeoff analysis because under such circumstances a best-value tradeoff simply was not possible. The agency was compelled to select Monster's technically equal, lower-priced proposal. In sum, GAO's best-value analysis was reasonable and lawful.

---

[23] Moreover, in what can only be attributed to an abundance of caution, the RFP specifically cautioned offerors that "[a]s proposals become more equal in their technical merit, the evaluated . . . prices become more important." AR 97. This quote reflects what is commonly understood about the best-value process—as the difference in the proposals' technical merits decreases, the relative weight of the proposals' offered prices increases. Conversely, as the difference between the proposals' offered prices decreases, the relative weight of the proposals' technical merits increases. Where, as here, there is no difference in the proposals' technical merits, price becomes the only remaining evaluation factor to distinguish one proposal from another.

2.      **Were the Terms of Monster's Bridge Contract Incorporated into Monster's Second FPR?**

Monster's second FPR stated that it was offering its service on a fixed-price basis and without the indemnification clause identified earlier by the PLCG. AR 1937, 1940, 1942. Nevertheless, plaintiff argued throughout its briefs and during oral argument that Monster's second FPR somehow incorporated the indemnification clause in Monster's bridge contract[24] as well as the bridge contract's time and materials pricing terms. Pl.'s Am. Mem. 18–19; Pl.'s Reply 8–10, 19–21; Tr. 67–74. Plaintiff's contentions are without merit.

For a contract to incorporate the terms of extrinsic material by reference, it "must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008). Monster's second FPR and the resulting delivery order did not reference the bridge contract, much less purport to incorporate any of its terms. AR Tabs 65, 70. Therefore, if a term from the bridge contract was incorporated into Monster's second FPR, it must have been by operation of law. Yet in its extensive briefing and oral argument on this matter, plaintiff failed to cite a single law or legal precedent that would support its incorporation argument.

Plaintiff merely offers that the bridge contract's terms must have been incorporated into Monster's second FPR because the bridge contract included "line items off Monster's [initial FPR] price table"—i.e., the Analytics Core and Education Product—which satisfied some of the RFP's requirements. Pl.'s Am. Mem. 18–19. The court is simply dumbstruck by plaintiff's theory. Plaintiff would have the GAO pay again for items already procured under the bridge contract, but this time on a fixed-price basis. *See* Pl.'s Reply 20–21 ("Monster in its [s]econd [FPR] did not propose that the agency terminate the [bridge contract] and repurchase those items under the RFP's fixed-price requirement. For this reason alone, Monster's proposal is tainted and must be disqualified."). This is, of course, nonsense.

The court rejects plaintiff's interpretation and holds that Monster's second FPR did not incorporate any of the bridge contract's terms. Instead, the courts approves of the steps taken by GAO to reflect the agency's previous purchases under the bridge contract, namely adjusting Monster's price proposal upward by $[redacted][25] for evaluation and award purposes *vis-a-vis* the total fixed price proposed by plaintiff.

---

[24] The parties removed the clause by amendment on August 6, 2008, following the PLCG outcome prediction. AR 1807.

[25] This represents the combined price of the Analytics Core and Education Product under the bridge contract.

## V.  CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's motion for judgment on the administrative record is **GRANTED**.  The Clerk of the Court is directed to enter judgment in favor of the United States.  Each side shall bear its own costs.

**IT IS SO ORDERED.**


s/ *Lawrence J. Block*
Lawrence J. Block
Judge

# APPENDIX A

**[redacted in full]**